WRIGHT, FINLAY & ZAK, LLP
T. Robert Finlay, Esq., SBN 167280
Robert B. Norum, Esq., SBN 240301
4665 MacArthur Court, Suite 280
Newport Beach, CA 92660
Tel: (949) 477-5050; Fax: (949) 477-9200
bnorum@wrightlegal.net; rfinlay@wrightlegal.net

Attorneys for Defendant,
WELLS FARGO HOME MORTGAGE, A DIVISION OF WELLS FARGO
BANK, N.A. (erroneously sued and served as "WELLS FARGO HOME
MORTGAGE, an entity form unknown")

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH BOHR and ELIZABETH PROPP, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO HOME MORTGAGE, an entity form unknown, and FIDELITY NATIONAL TITLE INS. CO., a business organization form unknown, and Does 1 to 100, inclusive, <br><br> Defendants. | Case No: SACV 11-00369 JST (MLGx) <br><br> HON. JOSEPHINE STATON TUCKER <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT** <br><br> **[Federal Rules of Evidence, Rule 201]** <br><br> <u>Hearing:</u> <br> Date:   May 2, 2011 <br> Time:   10:00 a.m. <br> Ctrm:   10A |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, IF ANY:**

-1-

**PLEASE TAKE NOTICE** that Attorneys for Defendant, WELLS FARGO HOME MORTGAGE, A DIVISION OF WELLS FARGO BANK, N.A. (erroneously sued and served as "WELLS FARGO HOME MORTGAGE, an entity form unknown") requests, pursuant to *Federal Rules of Evidence*, Rule 201, that the Court take judicial notice of the following documents in connection with their Motion to Dismiss the Complaint of Plaintiffs filed concurrently herewith:

1.     The article entitled "Councilman: Why I stopped paying my mortgage" from the May 7, 2011 Orange County Register online Business section (http://huntingtonhomes.ocregister.com/2011/03/07/councilman-why-i-stopped-paying-my-mortgage/130687/); a true and correct copy of which is attached hereto as Exhibit "1".

2.     A Deed of Trust recorded on December 29, 2006, in the Orange County Recorder's Office, bearing document number 2006000872427, a true and correct copy of which is attached hereto as Exhibit "2".

3.     A Notice of Default and Election to Sell Under Deed of Trust recorded on October 13, 2010, in the Orange County Recorder's Office, bearing document number 2010000517333, a true and correct copy of which is attached hereto as Exhibit "3".

4.     A Notice of Trustee's Sale recorded on January 19, 2011, in the Orange County Recorder's Office, bearing document number 2011000033485, a true and correct copy of which is attached hereto as Exhibit "4".

///
///
///
///
///
///
///

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT

1        5.    Declaration of Keith Bohr dated February 2, 2011, which was

2    attached to Plaintiff's Ex Parte Application for Temporary Restraining Order and

3    Order to Show Cause Re: Preliminary Injunction.

4                                Respectfully submitted,

5                                WRIGHT, FINLAY & ZAK, LLP

6    Dated:  April 4, 2011      By:    */s/ T. Robert Finlay*

7                                T. Robert Finlay, Esq.

8                                Robert B. Norum, Esq.,
Attorneys for Defendant,

9                                WELLS FARGO HOME MORTGAGE, A

10                               DIVISION OF WELLS FARGO BANK,
N.A. (erroneously sued and served as

11                               "WELLS FARGO HOME MORTGAGE, an

12                               entity form unknown")

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

# EXHIBIT 1



| REAL ESTATE | JOBS | CARS | DEALS | CLASSIFIEDS | PLACE AN AD | SUBSCRIBE |

SURF REPORT/C

| HOME | NEWS | SPORTS | **BUSINESS** | ENTERTAINMENT | LIFE | TR |

Automotive news | Blogs | Columns | Economy | National Business | Photos | Real Estate News | Retail | Small Business | Sto

# HUNTINGTON HOMES

**By Marilyn Kalfus**

### Councilman: Why I stopped paying my mortgage
**March 7th, 2011, 12:30 pm · 73 Comments · posted by Marilyn Kalfus, real estate reporter**

Tweet  Share

Huntington Beach Councilman Keith Bohr has released a written statement about his attempts to get a loan modification on his  $2.5 million Edwards Hill home, how it wound up in foreclosure and why he filed a lawsuit against the lender.



Here's what he says happened:

"My wife and I bought our home in the spring of 2005 for approx. $2.5m, with a traditional 20% cash downpayment of approximately $500k a traditional loan, not a subprime loan. We also invested in excess of $500,000 remodeling the 15-year-old home.

"As we all know the recession hit and our home of course has lost approx. 30% from the purchase price and the value is now considerably below the loan amount. In early 2010, I began communications with Wells in an effort to renegotiate a loan modification.

"After many months of little real progress I was informed by several people in the business and a couple of Wells employees that Wells will not truly negotiate as long as my loan is current.  So, I then stopped making my payments in the later part of 2010 and sure enough we started making some good progress, but have not yet successfully obtained a loan mod.  Please note we are not looking for principal reduction or any forgiveness of any deliquent payments, we are just looking for a market interest rate and new 30 year term.

"Nonetheless, negotiations seemed to stall and Wells began the foreclosure process so we initiated litigation for lack of proper notice and process.   The courts issued a stay of the foreclosure and we are once again in negotiations.



Bohr residence

"I might also note that we have paid approx. $100,000 in property taxes since buying our home and paid another $500k in mortgage payments to date.  Imagine, our frustration as we had planned to pay off our house entirely after receiving even a modest return on our investment in our LaSalle project.  Such is life we will continue to move forward whether we are successful in negotiating a loan modification or not.

"For those that I have copied on this email, please do not read into this in any way that we are asking for sympathy or pity, not at all, the economic losses have been absolutely stressful and disappointing, but nonetheless we have processed it and we know we are very blessed to have our happy. healthy families and great friends and we will move forward with a positive attitude and continue to work hard to provide for our loved ones."

Like Bohr, there are many people in Orange County who have filed lawsuits against banks because of mortgage-related matters, including loan modifications that ultimately were not granted. And of course, the banks have their own views about what went wrong.

I'll have a story on these issues coming soon.

.

**Next:** *Bohr on how his business landed in Chapter 7*

..

*Related:*

Councilman goes to court to save his home

*Latest from this blog ...*

Mortgage broker: 'Buy ... new socks or underwear'

Which H.B. ZIP saw a price boost?
$4 million house is going, going ... not sold
Buyer of 'worst' trashed house walks away
Winner bids $3,050,000, but can't get house, yet
On assignment ...
'Worst' trashed house is now pending sale
Once priciest H.B. house now a $2.3 mill short sale
See price chops on 30 Surf City homes
Why price rose on $3 million waterfront home

.

***Also in real estate news ...***

.

'Million Dollar Decorators' will duke it out
Subprime high roller's home gets foreclosure date
$3 million 'green' estate in the works
'Housewife's' mansion sells for $3 million
Minn. prosecutor sues Costa Mesa mortgage firm

**Posted in:** Foreclosures • Mortgages • Edwards Hill • Keith Bohr



ADVERTISEMENT

You can follow any responses to this entry through the **RSS 2.0** feed. You can skip to the end and
leave a response. Pinging is currently not allowed.

| **Reader Comments** |
| --- |
| Comments are encouraged, but you must follow our User Agreement. |
| 1.  Keep it civil and stay on topic. |
| 2.  No profanity, vulgarity, racial slurs or personal attacks. |
| 3.  People who harass others or joke about tragedies will be blocked. |

**73 Comments**



*Jerry Fullerton* says:

March 7, 2011 at 1:15 pm
I don't understand people who walk away from a mortgage they can afford to pay. The fact that his home is under-water is not a reason for Bohr to break the contract with his lender. No one forced him into this deal! The lender provided money for Bohr to buy his home and he PROMISED to pay it back. He gave his work of honor and went back on his word for no other reason than it is convenient for him. I guess it happens all the time but I still think people who take their personal honor so lightly should not be allowed to hold public office.
Post Reply



*SW* says:

March 7, 2011 at 2:22 pm
Jerry – I could not agree with you more.
It is too much to expect our elected officials to hold themselves to a higher moral compass? I know it is naive for me to think so in the modern age. None-the-less the ethics Keith Bohr is displaying here is a horrible example for the rest of society.
Bring back debtor-prison.
Post Reply



*Iron Balls* says:

March 7, 2011 at 3:15 pm
Exactly! He bought a house he can afford but doesn't want to pay what he promised he would because it dropped in market value. So, he stopped paying in order to force the lender to re-negotiate already agreed upon terms. I'm curious how many in forclosure are playing the same games as the councilman and how those are affecting the numbers of pending foreclosures.
If he doesn't want to pay, that's fine, but why wouldn't he expect to not be foreclosed on.
Post Reply



*Moral Compass* says:

March 7, 2011 at 4:18 pm
Asking the bank to take a loss so he can get a better interest rate is unethical and he should be forced out of office based on his own comments.



*dwpinc* says:

March 7, 2011 at 4:45 pm
What BS!!
Noone, and I mean noone, would invest $1.0M large of their own money and walk unless they were having severe, and I mean severe, financial issues. The whole purpose of 20% down is to ensure the owner won't walk.
Everyone has difficulties but you don't walk away just because it's underwater. It would be more credible if the owner really was having financial trouble and then made the choice to walk. You either can afford it or you can't.
Post Reply

 *ro* says:

March 7, 2011 at 4:46 pm

For the same reason businesses walk away from bad deals all the time, because the cost to maintain the current deal is greater than the sum of the penalties for breaking the current contract and cost of a creating a new contract.

Ethics has nothing to do with it.

If you had a contract with a supplier for 1 million widgets and your supplier misjudged the price such that there's no way they could afford to meet that contract, they would back out of the deal.

You'd be entitled to whatever concessions you could get them to agree to or take them to court and try to squeeze blood from a stone as they declare bankruptcy.

Morals and money go together like family and loans, you can mix them, but you're kissing that money goodbye.

Post Reply

 *dwpinc* says:

March 7, 2011 at 6:39 pm

You need a refresher in business RO, and ethics. I'd never do business w someone like you.

When the economy turns around, and it will just like it did in the mid 90s and after dot-com, you and you're ilk will be sitting around asking yourselves what happened.

Sure deals go bad, just like mortgages. That's different than what you are promoting.

Post Reply

*bulfinch* says:

March 8, 2011 at 1:23 am

Actually, RO is right. The mortgage holder has a put option and can exercise that option without recourse in most states. What stinks is when people squat in their places for up to 2 years after having sucked the equity out of their place with multiple Helocs. But defaulting on a contractual obligation is business as usual. I cannot believe how defensive people are on behalf of the banks. You'd think there'd be ten X the outrage over such moral turpitudes as divorce.

By the way, the economy never really 'turned around' it was a serial bubble economy; we replaced one asset bubble with another. This last downturn was not merely cyclical, it was systemic. We have crossed the Rubicon in this country.

 *jeffcali* says:

March 7, 2011 at 1:17 pm

so true…loans that are current don't get looked at for modification. the banks don't care about the people who did it right. they're actually laughing at those who put down 10-20% and took out a real loan, while the people who took out sub-prime and interest only's that can no longer afford their mortgage, they're more than happy to work with those people.

it's so arse backwards it drives me crazy.

once again, nice guy's finish last, while those that cheat the system continue to get
carried along on the nice guy's back.

Post Reply



*neversurprised* says:

March 7, 2011 at 2:09 pm

Why should someone be entitled to a loan modification simply because something he
invested in has declined in value. The bank laid out the funds to pay the old owner
and lender. They are on the hook for it.( don't even try to justify by splitting hairs and
saying they then sold the loan too...that is completely irrelevant ) He said he would be
also. He signed a promissory note agreeing to pay what the bank lent him. I doubt
very much that if it went up in value he was going to split the equity with the bank.
Once he signed ...it's his deal ...end of story. Stop the whining already and start living
up to obligations. Where is personal integrity these days?

Post Reply



*gouscoc* says:

March 7, 2011 at 1:17 pm

I can personally vouch for how little Wells Fargo helps in loan adjusting, mods or
anything else. They told me I would qualify for a great fed program they could offer
but only if I allowed them to foreclose first – this I found out about the funding and the
insurance and CUZIP investment they have been doing.

Post Reply



*DISCO* says:

March 7, 2011 at 4:30 pm

It's a simple business decision by both parties and though unethical completely legal.
Trump has been doing this for his entire career and while the last decade brought E-
trading to the masses this decade is the one for more strategic defaults and other
financial mulligans by folks who ten years ago would have felt it unacceptable.

Post Reply



*marketbuy* says:

March 7, 2011 at 1:22 pm

Give it up already!! You didn't live WITHIN your means. Now you want a free
handout? In this economy, it's all about "ME, ME, ME".
if you have the means to make payments and want to avoid the "strategic default"
bandwagon, then do the right thing!! MAN UP!

Post Reply



*Ermac* says:

March 7, 2011 at 1:26 pm

I am sorry but we can all agree WF blows. However, when you go to Vegas and lose,
do you cry to the Casino saying I thought I was going to win? Quit your crying and pay

up like a man. Stop asking for handouts that in the end will be funded by the taxpayer. No one held a gun to your head saying buy the $2.5 million dollar home. If you have $500K for a down payment, guess what, there were properties you could have got at that price, but admit it, you didn't like them and wanted to live like a king, with none of the risks or responsibilities.

Post Reply

*hunterr83* says:

March 7, 2011 at 1:35 pm

He's not doing anything wrong by not paying. It's not like he's not making payments and then running off with the home. It's the same as if you were to purchase a car. If you stop making payments on the car, they take it back. No harm, no foul. It's all part of the contract.

Post Reply

*Ermac* says:

March 7, 2011 at 1:42 pm

But that's my argument exactly, he CAN make the payments, but chooses not to. It goes back to my Vegas example, when you lose, you lose, you don't try to what I consider cheat your way out of it by finding loopholes. Legal or otherwise. Again, no one forced him to buy the home. This is about ethics, and he is just another example of someone not willing to take responsibility for their own mistakes. What's worse is he is a government official! Instead of standing up and be an example, he is attempting to work the system. Very nice example for the community.

Post Reply

*Duh!* says:

March 7, 2011 at 2:19 pm

You are right.

No harm no foul.

He chooses not to pay his mortgage, therefore his home gets foreclosed (ie. the bank takes it back).

But noooooooooo he chooses to file a lawsuit to prevent the bank from foreclosing when he is the one that did not live up to his end of the contract.

Post Reply

*david wilson* says:

March 7, 2011 at 3:36 pm

Hunterr83: In case you hadn't noticed taking out a mortgage and then not making the payments IS wrong. It's call breach of contract. The council-wienie plainly states that he WILLFULLY stopped paying his mortgage because Wells Fargo wasn't giving him his loan mod. This is NOT a valid reason to default on your payments. This guy is just crying in his pretzels because of bad timing on the housing market. Man up you council-weinie and get a re-fi and pay the fees like the rest of us mortgage paying, word keeping Joes. You got nothing coming.

Post Reply

 *Overtaxed* says:

March 8, 2011 at 5:17 am

You don't nee a "valid reason" to default on your payments. Read your mortgage contract; there's nothing in there about "if you can't make the payments"; it spells out the consequences if you DON'T make the payments, and, in this case, it's in the homeowners interest to go that route. It's a simple business decision, morals/ethics have nothing to do with it at all.

Let me just explain something to everyone here; I know and work with lots of banks, and have a pretty decent insight into how they work. The bank (collectively) laughs at homeowners who are 50% (or more) underwater who continue to pay on their loans. They LAUGH at you because they simply cannot understand why someone 250K (for example) under a home wouldn't take the "free" option offered to them to default. It's like someone sitting with 10 dollar puts for a stock trading at 5 bucks and not using them; it's simply not something that they can understand.

Do what's best for you, and for your situation. Realize that defaulting has significant ramifications and perhaps consult a professional (accountant/legal). Don't concern yourself with "ethics"; that went out the window 30+ years ago (and really out the window for the last 15 years). Think about it this way; "What would the bank do?", and then, if that's the right move for you, make it. Banks have no morals, they only see in "profit". Make sure that you treat them the same way.

 *OC* says:

March 7, 2011 at 1:48 pm

Not once in this article do we hear about how the Councilman's income was reduced or negatively impacted in some way due to the decline in the economy.

Post Reply

*iloveoc* says:

March 7, 2011 at 1:56 pm

What a crybaby! Half a mil plus in remodeling in a 15 year old home? I really hope Wells Fargo files a counter suit. Why doesn't he go find another lender, instead of screwing with Wells Fargo? Because his house isn't worth what he paid for it? Welcome to what the rest of us are dealing with, without your resourses to hire a lawyer/lawsuit to get the results. MAN UP, quit your whining, be grateful you have a VERY NICE home you can make the payments on!

Citizens of HB, please don't elect this whiner again!

Post Reply

*Charlie S.* says:

March 10, 2011 at 6:21 pm

You don't have to worry about voting for him, he is termed out in HB City, can't run; but like the phony Councilperson Hansen, he has probably used the dais only as a stepping stone to his higher political ambitions State Assembly. The dems control it so

Bohr will be right at home, among malcontents, and people who never learned how to live up to their word, or within a budget. Sadly YEAH personal reponsibility went out the window with ETHICS long ago.

Interesting how "Birds of a feather do flock together"!

Life is tough and now you lose Mr. Bohr. Like ERMAC said you could afford a $500,000 dollar house; but your "RICH TASTES" , your Caddilac's, Porsches, and more were what "YOU NEEDED"!

Wow I would love to audit the cost breakdown and disbursements of your development loans, does your roommate, Ms Stoop, or is it your wife really make enugh money to support your expensive tastes? Political cocktail parties, mayor, developer, councilperson who has no qualms at all about screwing over others on a routine basis. Amazing your a BROKER- and you did not know what was going on in the 2000-2007 Pie-In-The-Sky BS Real Estate Mkt. created by speculators (such as you) and inexperienced liars, getting NINA loans on properties they in no way could ever pay back the loan on—then they cry foul the BANK SCREWED THEM? What a frigging joke. All the Realtors & Mortgage hacks who tout their "ETHICS" so routinely (isn't there a former HB city Councilperson in Jail serving time for her FRAUDULENT R.E. activities—remember that ) were as MUCH a PART of the COLLASPE of the R.E. mkt. then the Global crisis as BARNEY FRAG, and Chris Dodd (your friends Mr. Bohr) DIRECTED FANNIE AND FREDDIE to make loans to EVERYONE no matter what ( these two should be indicted right along with Tim Geitner) their REAL Financial condition.

You say you only want a market RATE adj. interesting, the rates in 2005 for your Jumbo loan were about 6.25% or less if you had REALLY GOOD CREDIT, obviously Wells did not think you deserved a lower rate, and the rates today are about 3/4% less. Is this really going to change your ability to make your payments? This is not realistic, WHAT ARE YOU SMOKING MR. BOHR? Conservatively speaking Mr. Bohr you would need to EARN about $650,000- $700,000 a year (STABILIZED INCOME– NOT ONE DEAL DEVELOPER INCOME) to qualify for a rate and term refi? If in fact you REALLY HAD THE INCOME, IF YOU REALLY HAD A STELLAR CREDIT RECORD, I can guarantee you Wells would be more than happy to accomodate you!! Me thinks (knows) there is a whole lot more to your story than you have shared. I have a real question for you, did you really expect the economy to get better under Obama? Mr. Bohr he is leading this country (trying) down the road of socialism which I assume you totally agree with, as an active Democrat and progressive. Being a developer runs counter to what the Socialist philosophy espouses. Profit is BAD didn't you know that? You should be living in a large Government run housing project. Your money, as your friend and idol the IDIOT Michael Moore says belongs to the people. We want to come over and get some of your extra money Mr. Bohr, do you have any? So many oxymorons Mr. Bohr. as everyone has said Man-Up. I wish you no ill will and honestly I am sorry for your mis-fortune; but when I see the people you agree with, who have caused this mess, the spendthrifts and the progressives, the socialists, the government Unions you support to the detriment of your City, to the DETRIMENT of this STATE, to the DETRIMENT of this COUNTRY, then you as CAPITALIST, the VERY people YOUR colleagues want to destroy, it makes me wonder what you are thinking? Anyone with a little common sense as a developer would NEVER have been budiling in 2006, anyone in R.E. (you say your a Broker-I hope your friends don't come to you for advice) would have to have their head examined to BUY AT THE

TOP OF THE MARKET IN 2005 or 2006, you were right there–your tongue wagging at that $2.5 milion dollar house, man if this shows your economic and fiscal intelligence I shudder to think of how many BAD BAD votes have been cast by you in the City of HB with your unintelliglbe thinking. You speak well, you sound like your know what your doing; but your ACTIONS SPEAK LEGIONS ABOUT YOUR FISCAL/ECONOMIC/DEVELOPER/REAL ESTATE KNOWLEDGE!! Sorry Mr. Bohr you–FAIL–F is your grade. Man-Up, turn a new page change your thinking change your life. P.S. NOT THE BARRY SOTERO– KIND OF CHANGE. Good Luck- Try Prayer. Also drop

the phony smoke-screen lawsuits-it really shows your stupidity. Modifications are for people who did the right thing trying to buy a home, who did not lie on the loan application (iwould love to see your loan application to Wells Fargo) who had a 10 or 20% dwn payment, who had a real job, who had real assets, who were in the middle to lwer income levels say $60 to 80,000 per year, who were not REAL ESTATE BROKERS and WHO DID NOT HOLD THEMSELVES OUT AS EXPERTS, just normal folks Mr. Bohr. You do not qualify for any kind of modification–ARE YOU HONESTLY TELLING THE WORLD THAT WELLS FARGO TOK AVANTAGE OF YOU A PERSON WHO IS A BROKER AND WHO ROUTINELY OBTAINED MULTI-MILLION DOLLAR LOANS? REALLY MR. BOHR?????

Post Reply



*neversurprised* says:

March 7, 2011 at 2:03 pm

This joker is kidding isn't he? He initiated a loan modicification because the value of his home went down. And exactly how is that the bank's fault and why should they have to eat it? They didn't make the purchase YOU DID! Maybe he should call his stockbroker too and tell him his stocks are down and he would like a subsidy on the share price since he paid more than they are valued now. What a loser.

He also wants to be commended for paying his property taxes and mortgage payments earlier in ownership. News flash....you were SUPPOSED to because you signed the papers saying you would. What happens to the value after you sign for the money is no ones problem or responsibility other than yours.

These people make me sick. You agreed, you signed ..step up and live up pto your obligations. The bank already lived up to theirs.

It's' called integrity....get some.

Post Reply

*Duh!* says:

March 7, 2011 at 2:21 pm

You did see the part of the article that says he is a politician (councilman), right? That means he has no integrity.

Post Reply

*Miles* says:

March 7, 2011 at 2:03 pm

Almost 2 years ago, my wife left me and moved out of our house. Half household income was gone, and I began the loan mod process, but kept making my payments, even though it was most of my income at that point. Like this guy, I wasn't asking for anything more than a rate reduction and a new loan, because that would put me in a place where I could afford the home on my own.

After over a year of the bank dragging their feet, I had no choice but to stop paying my mortgage, and I'm not in the process of short selling my home. The bank will of course no longer consider a loan mod as I am "showing intent to sell". No matter what you say about this guy, the system is completely broken, and the people that need the help are not getting it.

My case is a textbook example of who this plan was meant to help, and yet no help was given, and the banks don't care whatsoever.

Post Reply



*bulfinch* says:

March 8, 2011 at 1:26 am

Miles — sorry to hear about your runaround. You're right, your situation is far more understandable than most, and I can see someone wanting to work with their bank in your situation regardless of the housing boom/bust. Good luck.

Post Reply

*Caliman* says:

March 14, 2011 at 8:38 am

Everyone with a failed marriage should get a mortgage mod, a modified car loan and a credit card debt forgiveness, along with free markers at a major casino in Vegas and a private jet to get them there.

Post Reply

*eviltwin* says:

March 7, 2011 at 2:39 pm

Hmmm,....he probably could have nearly purchased a smaller home nearly outright. Hmmm, should I buy the 2.5 million home with a huge financial future risk. Or buy something easliy affordable with little or no risk. No Sympahty. None!

Post Reply

*matt h* says:

March 7, 2011 at 2:51 pm

stupid is what stupid does
banks dont build homes they dont supply materials they most likely dont have rights to the land
to owe a bank for borrowing a medium of trade is that stupid does
in all honesty this guy could be to smart to owe a bank

Post Reply

**Dave** says:

March 7, 2011 at 3:01 pm

I don't understand why this guy needs a loan modification since he secured traditional financing and put 20% down. It also appears that he can afford the monthly mortgage.
To stop paying a mortgage just to secure a lower interest rate is S-T-U-P-I-D. It looks like he got bad advice. Now his credit is ruined, and he may lose his home.
Only unanswered question is if he pulled 500K out of the home equity for the remodel. If he did, I understand a little better why he is seeking a loan mod.
Final comment which is sort of a life philosophy to avoid economic stress like this guy is under: "Less is More"

Post Reply

**John** says:

March 7, 2011 at 4:35 pm

I don't buy his story. He is basically saying that he can afford the payment (which I don't believe) and all he wants is a loan mod with lower rate and new terms. And he is willing to ruin his credit for this? Seriously? Sounds like a fishy story.
If he can truly afford his payment, he could have waited a bit….(economy has improved a bit) and banks are actually making loans now for well-qualified buyers. He says he put down 20% originally and has also made 500K in additional payments, so if could could come up with a bit more, then bank would have probably given him a new loan.
Most likely scenario is that he is running out of money and he knows he will lose his home in the future, so he's playing these games.
His story makes no sense and looks like a lie to me.

Post Reply

**dwpinc** says:

March 7, 2011 at 6:43 pm

I was thinking the exact same thing. It's pretty clear he's out of money and that's the way it goes. Better off being quiet about it and moving on.

Post Reply

**Gfartolo** says:

March 7, 2011 at 3:03 pm

because i don't want to pay my mortgage. that's why

Post Reply

**OC-Homeowner** says:

March 7, 2011 at 3:06 pm

I would agree with the posters, however, many of these lenders and investors were the first to go crying to the feds when the economy turned south and were bailed out (by both, the last and the present administration).

Post Reply



*syscom3* says:

March 7, 2011 at 3:14 pm

If the banks accepted govt funds to help them through the meltdown, then they must accept the fact that people can demand changes in the loans to reflect current realities.

I say he shouldnt pay anything untill the bank agree's to a loan modification. Time for the little guy to fight back against the banks.

Post Reply

*skp* says:

March 7, 2011 at 3:21 pm

My husband and i had to go through it. A lot of people are going through it then you think. He is not doing anything wrong.

Post Reply

*ability2reason* says:

March 7, 2011 at 9:51 pm

You and others like you make it more costly and more difficult for everyone else to get a loan. And you think you did nothing wrong. Selfish. Shameless. Pitiful.

Post Reply

*Frank* says:

March 8, 2011 at 6:18 am

Yes! Let's return to proper underwriting standards!

It SHOULD be more difficult to get a loan than it has been. Banks SHOULDN'T give out home loans to just about anybody with a pules. Bankers SHOULD think long and hard (about three seconds should be plenty) about what will happen if the value of all their bubblicious collateral bursts.

Maybe I'm selling the bankers short. Could be plan B was to squeeze the taxpayers with the carrot of generous campaign aid and the stick of scary, scary stories about credit crunches.

Gee, do you think politicians go the head of the line when it comes to stupid loans? Naaaaah. Couldn't be.

Post Reply

*Caliman* says:

March 14, 2011 at 8:42 am

When my wife and I were unable to afford the lifestyle to which we are entitled, we liquidated our childrens college fund.

A lot of people are going through it then you think. He is not doing anything wrong.

By the way, you are your husband are losers, that is why you need a Mod.

I bet you drive luxury cars too.

Post Reply



*tmare* says:

March 7, 2011 at 3:30 pm

He sounds like he is looking to refinance. Good luck doing that when you owe so much more than the home is worth. You can't refinance, so you stop paying? How much less are you expecting the interest rate to be? Sounds like someone isn't telling the truth.

Post Reply



*panhead20* says:

March 7, 2011 at 3:56 pm

I guess I picked the wrong career. $2.5M home on a HB city counsilman's salary.

Post Reply



*kingkong5* says:

March 7, 2011 at 4:27 pm

Huntington Bell?

Post Reply



*OC Appraiser* says:

March 7, 2011 at 8:59 pm

That should be the real story. Reporters should do some digging, ie work. There is a BIG story behind this story.

Post Reply



*Reader* says:

March 8, 2011 at 1:03 pm

He's a developer, involved in many other ventures (wheeler-dealer?).
That said, odd that his original $2 million loan is now higher than that (maybe he didn't get sub-prime as he states, but possible Option ARM as he awaitied possible success of his San Pedro proejct with TEAM and Bergsma??) and his last property tax bill is still unpaid, even as the new one is due in Arpil. That is some tax on a $2.5 million home!



*Charlie S.* says:

March 10, 2011 at 6:29 pm

AMEN to that , there is a whole lot more to this than Mr. Bohr is telling



*Disney Dad* says:

March 7, 2011 at 4:00 pm

Wow! So much for the old "nose to the grindstone" ethic…now, it's just "things didn't work out MY way, so I won't keep my end of the deal, AND file a lawsuit over technicalities, even though I was well aware I was in default".

So his other investment didn't work out so he could PAY OFF the entire amount!! And now this cheeseball explanation is supposed to be, what, a reason? Give me a break!! Maybe not bankrupt financially…but morally, empty as they come!

Post Reply



*tmare* says:

March 7, 2011 at 4:17 pm

I bought my house in 2004, it isn't worth what I paid. That's life but fortunately I didn't get myself in over my head and pour a whole bunch more money into a declining asset. I understand that the bank probably received a lot of money from the government and they aren't doing the right thing either but this guy obviously isn't blameless in this situation. He says he isn't asking for a reduction in principal but I somehow doubt that. He is willing to go into foreclosure over a percent or two on the loan but he should know darn well that banks aren't refinancing underwater homes for people who have the means to pay their mortgage.

Post Reply



*bulfinch* says:

March 8, 2011 at 1:34 am

Who rooked whom into the mortgage? Set aside what you think of this guy and whatever his machinations might be (I'll grant you, my sympathy gland is not firing overtime for him), and consider who made out more by originating the loan in the first place: Ultimately, it is the banks that were scrounging around for loans to package up and sell as MBS.

This guy is an overpaid turkey, but set aside a little ire for the banksters.

Post Reply

*CA49r* says:

March 7, 2011 at 4:26 pm

Wells Fargo is the worst! Good luck with them. I will definitely never use them for a loan again. The worst customer service on the planet earth. The government and these banks put us in this mess (crashed economy) and we are all looking for them to do the right thing. Do they do it? No! People are getting fed up with this mess they put us in and we feel like there is no hope or justice. Good luck Mr Councilman.

Post Reply

*unclewill* says:

March 7, 2011 at 4:56 pm

This is what happens when the music stops and you are the only one left standing.

Post Reply



*imacobru* says:

March 7, 2011 at 4:57 pm

Councilman: Why I stopped paying my mortgage – Here is what he actually said: '
Blah, blah, not my fault, blah, blah, the banks fault, blah, blah, blah....not my fault, the
banks fault, blah, blah and blah. Oh and did I mention that it is not our fault but the
banks, blah, blah & blah. Don't forget to reelected me in the next election.

Post Reply



*perplexed* says:

March 7, 2011 at 5:21 pm

The councilman has been advised to do a strategic default, even his letter was
probably drawn up by his lawyer. I understand his frustration but what I do not
understand the government or bank would even allow people who own homes that
are worth 2million plus to do a loan mod. These people have the means to live a
decent life if they were ever evicted from their home. With that said, it basically comes
down to the councilman wanting his home at a discounted rate. If the banks say no,
then move on Mr.Councilman. Why are you wasting time and your credibility in the
community on a subject that no one has pity for you. It is not like you are losing your
400k home and you will be on the streeet. I am assuming you have a decent salary.
Let the home go to someone who can afford it. I do not walk into the dealership and
buy a car and then go back and demand the dealership give me a better rate on my
vehicle years later. I am starting to feel more sympathy towards the banks now
hearing all these well to do families trying to take advantage of a system that was
meant to help people avoid living on the streets. This councilman is trying to take
advantage of a loophole. Sorry but you can downgrade to a 300k home and still live
comfortably. Your basically teaching your kids that your signature and word do not
mean much these days. Counter suing a bank to force them to do a loan mod? Geez
anyone in this country can basically sue for any nonsense.

Post Reply



*soundsfamiliar* says:

March 7, 2011 at 6:59 pm

Cry me a river, councilman. The majority of homeowners who bought within the past
eight years are underwater. What if we all simply decided we didn't want to keep
paying our mortgages? People who've taken pay cuts (us included) and lost jobs are
still doing whatever they can to make their mortgage payments; you need to do the
same.

I can't believe people are defending his contractural rights. Just because something's
legal doesn't make it right. I expect public servants to have higher standards if they're
going to get my vote.

Post Reply



*bulfinch* says:

March 8, 2011 at 1:44 am

People who've taken pay cuts (us included) and lost jobs are still doing whatever they can to make their mortgage payments; you need to do the same."
Which benefits...whom, exactly? Frankly, I think everyone in America should stop paying their mortgage yesterday. It is your only weapon against the banks, but unfortunately, the public is too wrapped up on what their neighbor's finances are, or too medicated or too brainwashed...I don't know what it is, but the lack of anger toward banks is truly surprising. And dismaying. Even BANKERS ARE SURPRISED HOW EASY THEY GOT OFF.

I say, default before it's too late — meaning, before you're even more underwater, and even more of the toxic sludge MBS garbage (part of which includes your mortgage note) has been transferred by the banks back to the taxpayer via backdoor MBS purchases by the FED.

By the way, banks and corporations (which are apparently tantamount to people now, given the recent Supreme Court ruling) exercise their put option on failing investments all the time.

Post Reply



*soundsfamiliar* says:

March 8, 2011 at 12:33 pm

" . . . transferred by the banks back to the taxpayer . . . "
So go ahead and screw ourselves and others even more? Sorry, I actually abide by the documents I sign. Silly me, perhaps; but at least I can look myself in the mirror. Where would we be if everyone did this?

Post Reply



*Dr. Monk* says:

March 7, 2011 at 7:12 pm

GREED...How did home prices climb so quickly? Let's see..Home appraisals...banks believing them...REALTORS....pushing the sale.. Sounds like a scam to me.
There is still lots of Obama cash available. He will just keep printing more and more cash. Still lots to go around.
Gold is $1431, and increasing by the minute, 24 hrs a day, 7 days a week.

Post Reply



*Dude* says:

March 7, 2011 at 9:44 pm

This guy is just like all the big spenders in my area. I am going to guess like my loan rich friends, hes a democrat. I bet he never made more than $600K per year, which is about what you need to make for 20 years straight to afford this house and taxes.
Why do democrats not do the 10th grade math before buying? He fixes up the house, he buys a fancy car, and then he complains when he cant pay for the home?
Democrats need to be jailed!

Post Reply



*Peter L.* says:

March 8, 2011 at 2:11 am
Another member of the entitlement generation messes it up for future generations.
You made the bad decision and you should suffer for it.
I have no sympathy for your generation, your greed, attitude of entitlement and poor
judgement has destroyed the future for the generation that follows you.
Your irresponsible generation has condemned the rest of us to cleaning up after your
mess(es) and to suffering the consequences of your profligacy.
Shame on you all!
Post Reply



*golfbumm* says:
March 8, 2011 at 2:19 am
Something very strange about this entire story. A city councilman salary can support a
2.5 million dollar home purchase ?
Just how much does Huntington Beach pay this clown a year that's the question ? Oh
I know I know the solution to all his problems he should ask the people of Huntington
Beach for a raise , problem solved . I'm thinking I might like to move back to the states
and run for city councilmen in HB .
Post Reply



*R. Jain* says:
March 8, 2011 at 7:03 am
This is not a question of ethics or morality. Both parties are attempting to maximize
their financial benefit as permitted by the contract and the law. Morals and ethics
enter the picture in dealings between individuals. Once we are dealing with
corporations, especially big corporations, it's all about contracts and law. If we have to
invoke morality in the end, why the heck do we sign reams of fine print and pay a lot
of money to lawyers and brokers?
I say, Councilman, you go ahead and do what's best for you.
Post Reply



*tallshortgirl@aol.com* says:
March 8, 2011 at 7:44 am
This story sickens me, and I'd like to know how many politicians were in cahoots with
mortgage lenders and realtors. If he put down 500K why the heck didn he not buy with
a fixed interest rate?? In 2005, what was the fixed rate? The option ARM , and
interest only loans were all part of the scheme, with the buyer drinking the kool-aid
and gambling on the values to continue the 10 to 15% yearly increases, and locking in
later. Well here we are, and there are no easy fixes. Crimes have been commited in
all phases and areas of the housing industry, but there has been NO accountability
and no punishment. I hope this councilman gets voted out next term, he gets no
sympathy from me!!
Post Reply



*Dan Dresser* says:

March 8, 2011 at 8:52 am

Mr Bohr: Go to http://www.livinglies.wordpress.com and learn how the big banks have stolen $20 trillion from America and they are still getting away with it. Most people do not have a clue as is obvious from reading these comments. Wells Fargo will not do a modification. We have been trying for two years. You need to get a lawyer who understands the fraud. But this will be difficult in your state. Good luck! http://www.msfraud.org is also an excellent site.

Post Reply

 *greenlunch* says:

March 8, 2011 at 9:59 am

Bohr: Please note we are not looking for principal reduction or any forgiveness of any deliquent payments, we are just looking for a market interest rate and new 30 year term.

Hey councilman Douchebag, you signed a mortgage note when you purchased; why is it up to Wells to give you better terms now?

As a councilman, shouldn't you show some personal resposibility instead of trying to use the courts to try and ripp off Wells for more than you already have?

Post Reply

 *Grunchy* says:

March 8, 2011 at 4:18 pm

What a shame. bad investment decisions…for both the homeowner and the bank. Both are losers. I'll be renting until the crazies stop running the housing market.

Post Reply

 *Half a Million???* says:

March 8, 2011 at 5:59 pm

Dude, you Paid $2.5 million for a 15 year old house and THEN sunk almost $500K into remodeling the place??? Completely irresponsible and foolish. Do you have a brain inside your head? If you spend your "own" money like this, how do you spend the taxpayers' money??? You should not hold public office. You have no sense of financial responsibility.

And yes, just like "Dude" above, I'm guessing your a (tax and spend) Democrat.

Post Reply

 *OCTrojan* says:

March 8, 2011 at 10:14 pm

Why are people so upset over his decision to choose an alternate remedy that is provided for in his promissory note and deed of trust? The loan terms give you a choice: 1. pay and keep your home, or 2. don't pay and the bank will foreclose. Bohr chose not to pay, a gamble of sorts, and it's up to the bank to take the home or not. If the bank chooses to deal with Bohr and modify, what's wrong with that? Nobody is forcing the bank to modify. If the bank chooses to foreclose, nothing wrong with that either.

Post Reply



*Caliman* says:

March 14, 2011 at 8:51 am

There is nothing wrong with shoplifting or burglarizing your home if I have to feed my family, right?

Post Reply



*Kari* says:

March 9, 2011 at 7:06 am

I'm with Bohr on this one. Great business decision. Ive been dealing with banks and foreclosures nationwide for over three years now, and Wells Fargo is by far and away, the worst one. Councilman Bohr should check out http://www.bankclassactions.com/ and order both the forensic audit and securitization audit to give him ammunition to fight this bad entity. Best of luck.

Post Reply



*Caliman* says:

March 14, 2011 at 8:52 am

Spam for scammers.

I bet you get a TON of clickthroughs from OC.

Post Reply



*klarek* says:

March 9, 2011 at 1:29 pm

This guy is a) a concilman, b) a real estate agent/broker, and c) a shining example of a self-entitled deadbeat that wants to gamble with other people's money while assuming any gains, but push the losses on the lender (and potentially taxpayers). I would love to see tough legislation making these deadbeats castigated from the financial community for life. Even better, make them pay back every cent that was lost. That will stop them from pulling this selfish crap in a heartbeat.

Post Reply



*Charlie S.* says:

March 10, 2011 at 6:39 pm

JUST A TYPICAL POLITICIAN/PROMOTER (TYPICAL DEM.)
HEY I HEAR THERE IS A HOUSE QUITE A BIT CHEAPER CLOSE TO CITY HALL, I THINK YOU MAY BE ABLE TO MAKE A DEAL ON IT IF YOU ARE WILLING TO STEP DOWN ABOUT A $1.5 MILLION, I THINK THE OWNERS NAME IS "RIZZO" OR SOMETHING LIKE THAT, MAYBE
YOU GUYS COULD BECOME FRIENDS HE MIGHT WANT TO TRADE UP TO YOUR HOUSE–IT'S A WIN-WIN WIN!! ALL YOU NEED IS A DITZY BLONDE/BRUNETTE REALTOR SINGING "NOW IS THE PERFECT TIME TO BUY,, LA -LA-LA NOW IS THE PERFECT TIME TO BUY!! ISN't IT ALWAYS? REALTORS

ARE AN EMBARASSMENT TO THEMSELVES. I OVERHEARD SOMETHING ABOUT RIZZO, AND A BIG HOUSE OR SOMETHING LIKE THAT, ANYWAY–YOU COULD WALK TO WORK AND SAVE A GREAT DEAL OF GAS LIKE MR.OBAMA WANTS YOU TO DO AND BE REAL GREEN PEOPLE, SO IT IS REALLY A WIN-WIN.

Post Reply

*Caliman* says:
March 14, 2011 at 8:29 am
  What a scammer.
  What a liar.
  What a thief.
  What a fraud.
  Unfortunately, he is also the perfect political representative of California in general and Orange County in particular.
  This is the cancer that killed California,

Post Reply

*Bob S* says:
March 17, 2011 at 4:48 pm
  I gotta wonder how much we pay city councilmen that they can put 1/2 a million down on a house and another half million for a re-model…
  As far as the loan, yes, the banks took advantage of Bill Clinton repeal of the 1933 banking law that stopped the great depression…
  In 2000, the banks went back to doing all the wrong things, because they were allowed to, as a result the value of homes shot through the roof… 10 years later that ghost equity disappeared… NO ONE, not even criminals like this guy should be saddled with ghost equity… the banks should have to eat it and eat it all…
  If not for Clinton's stupidity, that house would never have been on the market for 2.5 million in 2005… The Bank owes him the difference between what it would have sold for and what he paid for it… And he's not alone… Ghost equity appeared on every home, and the Banks pocketed it every where they could…
  While it was the Fed's fault, it was the Banks that profitted…
  The Fed needs to dig us out of this recession and the Banks need to give back the money they stole from Home Owners…

Post Reply

ADVERTISE OPTIONS

Self Service
Place an Online Ad
Place a Print Ad
Place a Classified Ad
Media Kit
Advertising Contact
Info

CONTACT OCREGISTER

About Us
Careers
Contact Us
Corrections
Customer Service
Subscribe Today
Subscriber Services
Site Help
Site Feedback

OCR SERVICES

Archives
Buy Our Photos
California Lottery
Deals
OCRegister Fanshop
Orange County
Businesses
Register Insider
Register in
Education

NEWS YOUR WAY

Blogs
E-Mail Newsletters
E-Register
Mobile
RSS
Article Map
Site Map
Video

A

Classi
Cars
Deals
Jobs
Real E
Place
View c

KDOC
MSNE
OC E>
Coast
Prefer
Orang
Freed



Copyright © 2011 Orange County Register Communications. All Rights Re
Privacy Policy | Site Help | User Agreement | Site Map

# EXHIBIT 2

Branch :F01,User :A137                    Comment:                              Station Id :NGAJ

**OLD REPUBLIC TITLE**

Recording Requested By:
WELLS FARGO BANK, N.A.

Return To:
WFHM FINAL DOCS X9999-01M
1000 BLUE GENTIAN ROAD
EAGAN, MN 55121
Prepared By:
WELLS FARGO BANK, N.A.

247900 5152-65

1595 SPRUCE ST,, RIVERSIDE, CA
925070000

**Recorded in Official Records, Orange County**
**Tom Daly, Clerk-Recorder**

||||||||||||||||||||||||||||    66.00
**2006000872427 08:00am 12/29/06**
113 28 D11 21
0.00 0.00 0.00 0.00 60.00 0.00 0.00 0.00

RECORDING REQUEST BY: DPS
ON BEHALF OF: DPS

―――――――――――[Space Above This Line For Recording Data]―――――――――――

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated DECEMBER 19, 2006
together with all Riders to this document.
(B) "Borrower" is KEITH B. BOHR AND ELIZABETH J. PROPP, HUSBAND AND WIFE

Borrower's address is 18602 QUARTERHORSE LANE
HUNTINGTON BEACH      CA 92648        . Borrower is the trustor under this Security Instrument.
(C) "Lender" is WELLS FARGO BANK, N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES
0071257729

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005  1/01
VMP®  -6(CA) (0207).01
Page 1 of 15                                        Initials:
NMFL #3005 (CACD) Rev 8/21/2006
    VMP Mortgage Solutions, Inc.

Branch :F01,User :A137                    Comment:                         Station Id :NGAJ

Lender's address is **P.O. BOX 17339, BALTIMORE, MD   212971339**

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is **FIDELITY NATIONAL TITLE INS CO**
**17911 VON KARMAN, SUITE 200, IRVINE, CA  92614**
(E) "Note" means the promissory note signed by Borrower and dated
The Note states that Borrower owes Lender **TWO MILLION AND 00/100**
                                                                                    Dollars
(U.S. $ **2,000,000.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **JANUARY 01, 2037**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

VMP®-6(CA) (0207).01                     Page 2 of 16              Initials:_____     Form 3005  1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                                              of ORANGE                                          :
    [Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

    SEE ATTACHED EXHIBIT "A"

**\*SEE ADJUSTABLE RATE RIDER**

Parcel ID Number: 159-392-03                          which currently has the address of
18602 QUARTERHORSE LANE                                                          [Street]
HUNTINGTON BEACH                          [City], California 92648              [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials:

VMP -6(CA) (0207).01                      Page 3 of 15                      Form 3005  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as
selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay
interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring
the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply
such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding
principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower
might have now or in the future against Lender shall relieve Borrower from making payments due under
the Note and this Security Instrument or performing the covenants and agreements secured by this Security
Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest
due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and
the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received
from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be
paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or
more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall
be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under
the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due
for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a
lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c)
premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance
premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow
Items." At origination or at any time during the term of the Loan, Lender may require that Community
Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and
assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to
be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives
Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's
obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

VMP -6(CA) (02071.01                          Page 4 of 15            Initials:              Form 3005   1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Branch :F01,User :A137                    Comment:                         Station Id :NGAJ

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6(CA) (0207).01                        Page 7 of 16                        Initials _____        Form 3005   1/01

Branch :F01,User :A137                              Comment:                                    Station Id :NGAJ

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

VMP®-6(CA) (0207).01                          Page 9 of 15                          Initials: _____          Form 3005  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Branch :F01,User :A137                        Comment:                          Station Id :NGAJ

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Branch :F01,User :A137                    Comment:                    Station Id :NGAJ

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

VMP -6(CA) (0207).01                    Page 12 of 15                    Initials                    Form 3005   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6(CA) (0207).01          Page 13 of 15          Initial          Form 3005   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                       KEITH B. BOHR                    -Borrower

_____          _____ (Seal)
                                       ELIZABETH J. PROPP               -Borrower

                                _____ (Seal)     _____ (Seal)
                                        -Borrower                              -Borrower

                                _____ (Seal)     _____ (Seal)
                                        -Borrower                              -Borrower

                                _____ (Seal)     _____ (Seal)
                                        -Borrower                              -Borrower

VMP® -6(CA) (0207) 01                  Page 14 of 15                Form 3005  1/01

ORANGE,CA                         Page 14 of 21               Printed on 2/18/2011 11:44:04 AM
Document: TD 2006.872427

Branch :F01,User :A137                          Comment:                          Station Id :NGAJ

State of California
County of RIVERSIDE                                    } ss.

On December 20 2006   before me, Michele Vu

KEITH B. BOHR AND ELIZABETH J. PROPP

                                                          personally appeared

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

MICHELE VU
COMM. # 1656122
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Apr 30, 2010

-6(CA) (0207).01                    Page 15 of 15        Initials: _____        Form 3005   1/01

ORANGE,CA                          Page 15 of 21              Printed on 2/18/2011 11:44:04 AM
Document: TD 2006.872427

Branch :F01,User :A137                         Comment:                                    Station Id :NGAJ

## GOVERNMENT CODE 27361.7

I cerify under penealty that the Notary Seal on the document to which this statement is
attached reads as follows:

NAME OF NOTARY:    _Michele Vu_

DATE COMISSION EXPIRES:    _Apr 30-2010_

COUNTY WHERE BOND IS FILED:    _Orange_

COMISSION NUMBER: _1656122_        VENDOR NUMBER: _US12_

I certify under penealty of perjury and the laws of the State of California that the illiegible
portion of this document to which this statement is attached reads as follows:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

subscribed to the with in instrument and acknowledged to me that he/she/they executed

the same in his/her/their authorized

Personally know to me (or proved to me on the basis of satisfactoy evidence) to be the

person(s) whose name(s) is/ are capacity (ies), and that by his/her/their signature (s) on

the instrument the person(s) or entity upon behalf of which the person(s) acted,executed

the instrument.

PLACE OF EXECUTION:  _Santa Ana_

SIGNATURE:    _____    DATE:  _DEC_ / _28_ / _2006_

ORANGE,CA                          Page 16 of 21                  Printed on 2/18/2011 11:44:04 AM
Document: TD 2006.872427

# INITIAL INTEREST<sup>SM</sup> ADJUSTABLE RATE RIDER
## (1-Year Treasury Index - Rate Caps)
### (Assumable after Initial Period)

THIS INITIAL INTEREST ADJUSTABLE RATE RIDER is made this 19      day of DECEMBER   2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Initial Interest Adjustable Rate Note (the "Note") to WELLS FARGO BANK, N.A.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
18602 QUARTERHORSE LANE, HUNTINGTON BEACH, CA  92648

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of      6.250%. The Note provides for interest only payments until the first fully amortizing principal and interest payment due date (the "First P&I Payment Due Date"), which is the first day of FEBRUARY, 2012    .

The Note provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Interest Change Dates**

The interest rate I will pay may change on the first day of JANUARY, 2012     , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is 0071257729

MULTISTATE INITIAL INTEREST ADJUSTABLE RATE RIDER - 1-Year Treasury Index (Assumable after Initial Period) - Single Family - Freddie Mac UNIFORM INSTRUMENT

NMFL #8361 (FM5R) Rev 5/12/2006

®-191R (0508)  **Form 5107 7/05**
Page 1 of 4  Initials:
VMP Mortgage Solutions, Inc.  (800)521-7291

Branch :F01,User :A137                              Comment:                                    Station Id :NGAJ

based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-QUARTERS                                                            percentage point(s) (              2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First P&I Payment Due Date, my monthly payment will be the amount sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. For payment adjustments occurring on or after the First P&I Payment Due Date, my monthly payment will be an amount sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than            11.250 % or less than                  2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than TWO                                                                                         percentage point(s) (              2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than              11.250  %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

**1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials: _____

**VMP®-191R (0508)**                    Page 2 of 4                    **Form 5107 7/05**

Branch :F01,User :A137                    Comment:                    Station Id :NGAJ

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

VMP -191R (0508)                    Page 3 of 4                    Initials:                    Form 5107 7/05

Branch :F01,User :A137                         Comment:                                    Station Id :NGAJ

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)         _____ (Seal)
KEITH B. BOHR                -Borrower    ELIZABETH J. PROPP           -Borrower

_____ (Seal)         _____ (Seal)
                             -Borrower                                 -Borrower

_____ (Seal)         _____ (Seal)
                             -Borrower                                 -Borrower

_____ (Seal)         _____ (Seal)
                             -Borrower                                 -Borrower

-191R (0508)                    Page 4 of 4                    Form 5107 7/05

ORANGE,CA
Document: TD 2006.872427

Printed on 2/18/2011 11:44:05 AM

Branch :F01,User :A137                         Comment:                                    Station Id :NGAJ

**ORDER NO. : 2479005152-05**

# EXHIBIT A

The land referred to is situated in the County of Orange, City of Huntington Beach, State of California, and is described as follows:

Parcel 1:

Lot 3 of Tract No. 13210, in the City of Huntington Beach, in the County of Orange, State of California, as shown on a Map recorded in Book 613, Pages 40 through 42, inclusive, of Miscellaneous Maps, Records of Orange County, California.

Excepting therefrom all oil, gas, minerals and other hydrocarbons substances lying below a depth of 500 feet but with no right of surface entry, as provided in instruments of record.

Also excepting therefrom all water, water rights, claims or title to water in, or under said land.

Parcel 2:

A non-exclusive easement appurtenant to such lot for ingress and egress, access, use and enjoyment, on, over and across the Common Area within the project, as more particularly described in the "Declaration of Covenants, Conditions and Restrictions for Huntington Beach Estates" (Declaration) recorded February 22, 1989 as Instrument No. 89-093629, in the Official Records of Orange County, California.

**EXHIBIT 3**

Branch :F01,User :A137                           Comment:                                    Station Id :NGAJ

---

Recording Requested By
and When Recorded Mail to:

Default Resolution Network
3075 Prospect Park Dr., Ste 100
Rancho Cordova, CA 95670

Recorded In Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖   **12.00**

**2010000517333 04:23pm 10/13/10**
66 406 N16 2

0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

---

Trustee Sale No: 10-02831-5JV
Loan No:  0071257729

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $44,325.31 as of October 11, 2010, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact :

**WELLS FARGO HOME MORTGAGE, ATTN: FORECLOSURE CASH**

---

ORANGE,CA                          Page 1 of 2                 Printed on 2/18/2011 11:44:05 AM
Document: ND 2010.517333

c/o Default Resolution Network
3075 Prospect Park Dr., Ste 100
Rancho Cordova, CA  95670
Phone: 916-636-0114 REF# 10-02831-5  JV

If you have any questions, you should contact a lawyer or the governmental agency which
may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you
may offer your property for sale, provided the sale is concluded prior to the conclusion of the
foreclosure.

**REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT
ACTION.  NOTICE IS HEREBY GIVEN THAT:** Default has been declared under a Deed of
Trust dated as of December 19, 2006, executed by KEITH B. BOHR AND ELIZABETH J.PROPP,
HUSBAND AND WIFE, as trustor, to secure obligations in favor of Wells Fargo Bank, N.A., as
Beneficiary, recorded December 29, 2006, as Instrument No. 2006000872427 of the Official
Records in the office of the Recorder of Orange County, California, and is subject to the terms
and conditions contained therein and that

The Deed of Trust encumbers certain property more particularly described therein (the "Trust
Property"), and that

The Deed of Trust secures the  payment of and the performance of certain obligations,
including but not limited to, the obligations set forth in a promissory note(s) with a face
amount of $2,000,000.00, and that

A breach of, and default in, the obligations for which said Deed of Trust is security has
occurred in that the trustor has failed to perform obligations pursuant to or under the Note
and/or the Deed of Trust, specifically: failed to pay payments which became due;   together
with late charges due; together with other fees and expenses incurred by the Beneficiary; and
that

By reason thereof, the present beneficiary under such Deed of Trust, has delivered to said
Trustee a Declaration and Demand for Sale, and has deposited with said duly appointed
Trustee such Deed of Trust and all documents evidencing the obligations secured thereby,
and has declared and does hereby declare all sums secured thereby immediately due and
payable and has elected and does hereby elect to cause the Trust Property to be sold to
satisfy the obligations secured thereby.

The mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to
California Civil Code § 2923.5(c) declares that the mortgagee, beneficiary or the mortgagee's
or beneficiary's authorized agent has either contacted the borrower or tried with due diligence
to contact the borrower as required by California Civil Code § 2923.5.

Date: October 13, 2010

Default Resolution Network
Agent for the Beneficiary
By: LSI TITLE COMPANY, its Agent

By: _____   **Marco Marquez**

# EXHIBIT 4

Recorded In Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖   12.00

2011000033485 11:38am 01/19/11

65 404 N34 2

0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

When Recorded Mail To:

Fidelity National Title Ins Co.
3075 Prospect Park Dr., Ste 100
Rancho Cordova, CA 95670

---

Trustee Sale No. 10-02831-5 JV        Loan No. 0071257729        Title Order No. 100629342-CA-BFI

APN 159-392-03-00

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED December 19, 2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On February 8, 2011, at 12:00 PM, at the North front entrance to the County Courthouse, 700 Civic Center Drive West, Santa Ana, CA, Fidelity National Title Ins Co., as the duly appointed Trustee, under and pursuant to the power of sale contained in that certain Deed of Trust Recorded on December 29, 2006, as Instrument No. 2006000872427 of Official Records in the office of the Recorder of Orange County, CA, executed by: KEITH B. BOHR AND ELIZABETH J.PROPP, HUSBAND AND WIFE, as Trustor, in favor of Wells Fargo Bank, N.A., as Beneficiary, WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER, in lawful money of the United States, all payable at the time of sale, that certain property situated in said County, California describing the land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

The property heretofore described is being sold "as is".   The street address and other common designation, if any, of the real property described above is purported to be:

18602 QUARTERHORSE LANE, HUNTINGTON BEACH, CA

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be made without covenant or warranty, express or implied, regarding title, possession, or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust (together with any modifications thereto).

The total amount of the unpaid balance of the obligations secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $2,087,551.18 (Estimated), provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale.  Beneficiary's bid at said sale may include all or part of said amount.  In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee.  In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right.  The property offered for sale excludes all funds held on account by the property receiver, if applicable.

Branch :F01,User :A137                    Comment:                                  Station Id :NGAJ

DATE: January 14, 2011
Fidelity National Title Insurance Company, TRUSTEE
10-02831-5JV
3075 Prospect Park Dr., Ste 100
Rancho Cordova, CA 95670
916-636-0114

Rozalyn Tudor Authorized Signature

**SALE INFORMATION CAN BE OBTAINED ON LINE AT www.fidelityasap.com**
**AUTOMATED SALES INFORMATION PLEASE CALL 714-259-7850**

ORANGE,CA
Document: NT 2011.33485

Printed on 2/18/2011 11:44:05 AM

# EXHIBIT 5

## DECLARATION OF KEITH BOHR

I, KEITH BOHR declare as follows:

1. I am a resident of the County of Orange. I am over the age 18. I have personal knowledge to the facts herein, and if called as a witness, I would competently testify to their veracity in court.

2. I am an owner of the property known as 18602 Quarterhorse Lane, Huntington Beach, CA 92648.

3. Due to my financial situation, I fell behind in my mortgage in 2009.

4. I applied for a home loan modification with WELLS FARGO in December 2010.

5. To date, I have not received a denial or approval in regards to the request for a home loan modification.

6. In addition, the Promissory Note associated with loan number 0071257729 requires that the borrower be provided with Notice of Default of the Mortgage obligation. WELLS FARGO Mortgage did not contact me to discuss my financial situation and explore options to avoid foreclosure prior to the Notice of Default being recorded nor prior to the Notice of Trustee Sale being recorded.

7. WELLS FARGO failed to advise me of our right to an in-person meeting to discuss options to avoid foreclosure.

8. On October 13, 2010, DEFAULT RESOLUTION NETWORK recorded a Notice of Default against my home.

9. On January 19, 2011, FIDELITY NATIONAL TITLE INS. CO. recorded a Notice of Trustee Sale against my home.

10. Prior to the time when the Notice of Default and Notice of Trustee Sale was recorded against my home I was not contacted by the lender to assess my financial situation and to explore options to avoid foreclosure.

11. WELLS FARGO Mortgage, through its trustee FIDELITY NATIONAL TITLE has a Trustee Sale set for February 8, 2011, for the subject property. Trustee sale No. 10-02831-5-JV.

---

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER FOR SHOW CAUSE RE
PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Executed on February 2, 2011, at City of Irvine, California.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

KEITH BOHR

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER FOR SHOW CAUSE RE
PRELIMINARY INJUNCTION

- 11 -

**PROOF OF SERVICE**

I, Gretchen Grant, declare as follows:

I am employed in the County of Orange, State of California.  I am over the age of eighteen (18) and not a party to the within action.  My business address is 4665 MacArthur Court, Suite 280, Newport Beach, California 92660.  I am readily familiar with the practices of Wright, Finlay & Zak, LLP, for collection and processing of correspondence for mailing with the United States Postal Service.  Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

On April 4, 2011, I served the within **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT** on all interested parties in this action as follows:

[X]   by placing [ ] the original [X] a true copy thereof enclosed in sealed envelope(s) addressed as follows:

Joseph R. Manning, Jr., Esq.
THE LAW OFFICES OF JOSEPH R. MANNING, JR.
A PROFESSIONAL CORPORATION
2010 Main Street, Suite 1080
Irvine, CA  92614
(949) 361-3232; FAC (866) 843-8308

Douglas W. Stern, Esq.
Southwest Regional Litigation Manager
FIDELITY NATIONAL LAW GROUP
A Division of Fidelity National Title Group, Inc.
17911 Von Karman Ave., Suite 300
Irvine, CA 92614

[X]   (BY MAIL SERVICE) I placed such envelope(s) for collection to be mailed on this date following ordinary business practices.

[ ]    (BY PERSONAL SERVICE) I caused to be delivered such envelope by hand delivered to the office of the addressee.

-1-

1  [ ]  (BY FACSIMILE) The facsimile machine I used, with telephone no. (949) 608-
2       9142, complied with California Rules of Court, Rule 2003, and no error was
3       reported by the machine.  Pursuant to California Rules of Court, Rule 2006(d), I
        caused the machine to print a transmission record of the transmission, a copy of
4       which is attached to the original Proof of Service.

5  [ ]     (BY ELECTRONIC MAIL) I caused each such document to be transmitted
6       electronically to the parties at the e-mail address indicated.  To the best my
        knowledge, the transmission was reported as complete, and no error was reported
7       that the electronic transmission was not completed.

8  [ ]  (BY NORCO OVERNITE - NEXT DAY DELIVERY) I placed true and correct
9       copies of thereof enclosed in a package designated by Norco Overnite with the
        delivery fees provided for.

10 [X]  (FEDERAL)  I declare that I am employed in the office of a member of the bar of
11      this court at whose direction the service was made.

12 [X]  I declare under penalty of perjury under the laws of the United States of America
13      that the foregoing is true and correct.

14      Executed on April 4, 2011, at Newport Beach, California.

15      _____

16      Gretchen Grant

PROOF OF SERVICE